IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

---

MELISSA R. CARLIN,

                Plaintiff,

     -vs-

GEAUGA SAVINGS BANK,

                Defendant.

---

: CASE NO. 1:11 CV 1418
:
: <u>MEMORANDUM OF OPINION AND</u>
: <u>ORDER</u>

UNITED STATES DISTRICT JUDGE LESLEY WELLS

    Before the Court is a motion for summary judgment filed by the defendant Geauga Savings Bank. The plaintiff Melissa R. Carlin has responded in opposition, and the defendant has replied. The defendant also provides additional, supplemental authority for the Court's review, to which the plaintiff has responded. Having considered the issues raised by the parties, in light of the record and the relevant law, the Court will deny the defendant's motion. The Court's reasons are stated below.

## I. Background

    The plaintiff Melissa R. Carlin alleges that while she was on maternity leave, her former employer Geauga Savings Bank ("GSB") requested that she return to work. Ms.

Carlin did not agree to return. Two weeks later, while still on leave, she was fired. GSB contends she was fired for a legitimate non-discriminatory reason (her poor work performance), but the plaintiff maintains GSB discriminated against her on the basis of her pregnancy, in violation of Ohio Revised Code § 4112.02. She further contends that her firing illegally interfered with her rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615, and that her termination was retaliatory in violation of the FMLA.

Beginning in 1999, Ms. Carlin worked for the defendant GSB in a number of capacities. She started as a temporary bank teller, but was eventually hired permanently, moving to the construction loans department. (Doc. 23-2, Pl. Ex. A, at 12-13). There, she was promoted to loan processor and later to loan originator. (Id. at 13). Then she moved to systems operations, where she was promoted to information security officer. (Id. at 13-14). As information security officer, Ms. Carlin was responsible for GSB's information security policies, risk policies, the implementation and audit of those policies, and day-to-day management of technology. (Id. at 14). Until the decision to terminate her, GSB was satisfied with Ms. Carlin's job performance, as she received regular merit raises. (Doc. 23-3, Pl. Ex. B, at 28-29; Doc. 23-13, Pl. Ex. L, at 24, 35). Ms. Carlin reported to Bank Executive Vice-President, Joan LaMarca. (Doc. 23-2, Pl. Ex. A, at 15).

Ms. Carlin learned that she was pregnant in early 2009 and notified GSB that she intended to take maternity leave. (Id. at 28). Ms. Carlin's due date was September 14, 2009. She planned to take two weeks of vacation plus 12 weeks of pregnancy and FMLA leave. However, Ms. Carlin's child was born two weeks early, necessitating an

2

early commencement of her leave. It was agreed that Ms. Carlin would return to work, following pregnancy/FMLA leave, on November 30, 2009. (Doc. 23-2, Pl. Ex. A, at 38).

After Ms. Carlin had taken leave, it came to GSB's attention that there was an issue with the bank's computer software, which is called the MISER system. The MISER system, which was developed by Fidelity, is a major component of GSB's IT structure that runs the day to day financial data of the bank. (Doc. 22-2, Def. Ex. A, at 45-46). In late October 2009, while Ms. Carlin was on leave, Ms. LaMarca was contacted by the GSB's contact at Fidelity, Carl Decker. Mr. Decker asked about the status of the testing of a scheduled upgrade of the MISER system, and he informed her that the testing should have been underway for the last 2-3 months. (Doc. 22-5, Def. Ex. D, at 2). According to Mr. Decker, GSB had a scheduled upgrade implementation date of November 2009. (Doc. 22-6, Def. Ex. E, ¶3). Mr. Decker stated that testing for the upgrade should have been completed by early September 2009. (Doc. 22-6, Def. Ex. E, ¶4). LaMarca began an inquiry as to the status of the project and she came to understand that GSB was far behind.

The upgrade was important because one of its components dealt with changing the process by which the computer system tracked property being used as collateral for various loans. Ms. LaMarca learned that the management of the upgrade was Ms. Carlin's responsibility, and once LaMarca learned how far behind they were in the process, she called Ms. Carlin, who was still on leave, and asked if she could assist in dealing with the problem. (Doc. 23-2, Pl. Ex. A, p. 88; Doc. 22-4, Def. Ex. C, pp. 46-47). Ms. Kimbrew, the head of human relations, was also on the telephone line, but she never identified herself, and Ms. Carlin was unaware that Ms. Kimbrew was listening.

3

(Doc. 23-3, Pl. Ex. B at 46; Doc. 23-2, Pl. Ex. A at 87). Ms. LaMarca informed Ms. Carlin of the issue with the upgrade, and Ms. LaMarca raised the possibility of Ms. Carlin working from home or participating in phone calls. (Doc. 23-2, Pl. Ex. A, at 90-93). Ms. Carlin stated that she would need to discuss it with her family and see how working would affect her disability insurance. (Doc. 23-2, Pl. Ex. A, pp. 90-93). The parties never followed up with respect to whether Ms. Carlin would return to work while still on leave.

A few weeks later, Ms. LaMarca, Barb Kimbrew, and Allen Lencioni, GSB's CEO and President, decided that Ms. Carlin should be fired.[1] (Doc. 23-3, Pl. Ex. B, at 61). On November 23, 2009, Ms. Carlin was called in for a meeting at the bank. (Doc. 22-2, Def. Ex. A, at 120-25). She was provided with a notice of termination, and she was provided an opportunity to make a statement, which she declined. (Id.). The notice of termination lists four basic reasons that the plaintiff was fired: (1) that her mortgage payments were excessively late; (2) that she failed to pay the employee portion of her Medical Premiums; (3) that she failed to submit a quarterly FLHB report which put GSB in "crisis mode"; (4) and that she failed to perform her duties in relation to the MISER upgrade. (Doc. 23-10, Pl. Ex. I).

At the time of Ms. Carlin's termination, it appears GSB was relying on all four of these reasons, collectively, as justification for firing her. Now, however, GSB's focus is exclusively on reason number four, that Ms. Carlin failed to perform her duties with

---

[1] According to Mr. Lencioni's testimony, it was his decision alone to fire Ms. Carlin.(Doc. 23-13, Pl. Ex. L, at 34).

respect to the MISER upgrade.[2] As defendant now explains, the firing was justified because management of the upgrade was Ms. Carlin's responsibility (Doc. 22-7, Def. Ex. F, ¶8), and in the months preceding Ms. Carlin's maternity leave, she failed to appropriately plan and communicate what needed to be done for the software upgrade. (Id. at ¶¶6-8). GSB claims that Ms. Carlin should have kept LaMarca apprised of the status of her IT projects, but she did not. (Doc. 22-2, Def. Ex. A, at 36). GSB further claims that as her leave was approaching, Ms. Carlin failed to prepare any memos advising LaMarca of pending projects or of what needed to be accomplished in her absence. (Id.). According to LaMarca, she had a conversation with Carlin immediately prior to Carlin's leave, and when asked whether there was anything that needed to get done, the plaintiff assured her there was nothing. (Doc. 22-4, Def. Ex. C, at 74). The defendant further points out that the minutes for a June 23, 2009 IT Committee meeting show no discussion of the status of the upgrade. (Doc. 22-2, Def. Ex. A, at 53-54).

Ms. Carlin disputes these assertions. As she sees it, GSB did not start preparing for her scheduled absence early enough, waiting until July or early August. (Doc. 23-2, Pl. Ex. A, at 30). GSB hired an outside IT consultant, Blaine Wolff, who was to fill in for Ms. Carlin in her absence, but the decision to bring on Mr. Wolff was made only a week before Carlin left, and GSB did not enter a contract with Mr. Wolf until after Ms. Carlin took leave. (Doc. 23-3, Pl. Ex. B, at 40; Doc. 23-2, Pl. Ex. A, at 34). Ms. Carlin says that prior to taking leave, she interviewed Mr. Wolff and discussed her day-to-day duties, the

---

[2] As discussed in more detail below, Ms. Carlin claims that the fact that GSB has apparently withdrawn three of its reasons for firing her provides evidence that GSB's remaining justification was pretext for unlawful discrimination.

5

projects that were underway, and what needed to be accomplished in her absence, which included the upgrade. (Doc. 23-3, Pl. Ex. A, at 32). The plan was to have Ms. Carlin and Wolff overlap prior to the plaintiff's leave, but this did not happen because her baby was born early.

Ms. Carlin further contends that she did in fact take adequate steps to prepare for her departure. She claims that Ms. LaMarca was well aware of her ongoing projects, including the MISER upgrade. (Doc. 23-2, Pl. Ex. A, at 40). Ms. Carlin testified that she had been discussing the property and collateral component of the upgrade with Ms. LaMarca for a year and a half prior to her taking leave. (Doc. 23-2, Pl. Ex. A, at 68). According to the plaintiff, she assigned Jason Bennett the responsibility of taking over the role of providing user support and working on the MISER upgrade. (Id. at 61). Carlin says she had several discussions with Mr. Bennett in regard to these issues, and she asserts that Mr. Bennett was charged with responsibility of setting up the test server and that Ms. LaMarca knew this. (Id. at 68-69). Ms. Carlin further maintains that she expressed her concerns to Ms. LaMarca about GSB's ability to complete her work while she was on leave. (Id. at 30-31).

Ms. Carlin claims that GSB's decision to fire her was motivated by a discriminatory animus with respect to her pregnancy and maternity leave, in violation of Ohio Revised Code § 4112.02. She further contends that GSB illegally interfered with her FMLA rights and that her firing was retaliatory under the FMLA. The defendant now moves for summary judgment.

## II. Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party,

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991) (moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial") (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir. 1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995). Read together, Liberty Lobby and Celotex stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 56. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989).

7

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Michigan Protection and Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994) (marking as standard that the plaintiff must present "more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). The nonmovant must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Id. (quoting in part Anderson, 477 U.S. at 257); see Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). The nonmoving party "must present significant probative evidence in support of its complaint to defeat the motion for summary judgment." Moore v. Philip Morris Co., 8 F.3d 335, 339-40 (6th Cir. 1993).

Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact. See Anderson, 477 U.S. at 248. If the nonmovant fails to present such affirmative evidence, then there is no need for a trial since there are no "genuine factual issues that properly can be resolved only by a finder of fact." Anderson, 477 U.S. at 247-48; see Celotex, 477 U.S. at 322-23.

Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex Corp., 477 U.S. at 324. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

8

the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).

### III. Discussion

*Ms. Carlin's Pregnancy Discrimination Claim*

The plaintiff asserts a pregnancy discrimination claim pursuant to Ohio Revised Code § 4112.02(A). That statute provides, in pertinent part:

> It shall be an unlawful discriminatory practice:
>
> (A) For any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Ohio Rev. Code § 4112.02 (A). Federal case law interpreting Title VII of the Civil rights Act of 1964 is applicable to cases involving allegations of violations of O.R.C. § 4112. Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n, 421 N.E.2d 128, 131 (1981). Title VII's prohibition on employment practices that discriminate "because of [an] individual's sex," 42 U.S.C. § 2000e–2(a)(1), applies with all its force to employers who discriminate on the basis of pregnancy. See 42 U.S.C. § 2000e(k); Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 89–90 (1983).

9

When, as here, a plaintiff provides no direct evidence of discrimination, courts use the *McDonnell Douglas* burden shifting framework in order to evaluate a pregnancy discrimination case. See Asmo v. Keane, Inc., 471 F.3d 588, 592 (6th Cir. 2006). The *McDonnell Douglas* analysis first requires that the plaintiff present a *prima facie* case of discrimination. If the plaintiff succeeds, the burden shifts to the defendant employer to provide a legitimate non-discriminatory reason for the adverse employment decision. If the employer meets its burden, the burden shifts back to the employee to show that the employer's stated reason for taking the action it did was a pretext for intentional discrimination.

The plaintiff's burden to make out a *prima facie* case of discrimination is not meant to be onerous. Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir. 2007). And, in this instance, Ms. Carlin has met her burden. To make a *prima facie* case of pregnancy discrimination, a plaintiff must provide evidence by which a reasonable jury might conclude that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 658 (6th Cir. 2000).

In the present case, the defendants do not dispute that the plaintiff has satisfied the first three elements. The only issue is whether record evidence supports the conclusion that there is a nexus between Ms. Carlin's pregnancy and her termination. The plaintiff has supplied the required evidence. In the Sixth Circuit, temporal proximity between protected activity and termination may be sufficient evidence to satisfy the

nexus requirement. Asmo, 471 F.3d at 593. In Asmo, a panel of the Sixth Circuit was satisfied that the nexus requirement had been met where the evidence showed that two months after learning that the plaintiff was pregnant the defendant employer terminated her employment. In the present case, while Ms. Carlin was on maternity leave, her supervisor urged her to return from leave early. Ms. Carlin did not agree to return, and two weeks later, GSB terminated her employment. The plaintiff was on leave at the time of her termination. In the Court's view, this evidence supports the "nexus" requirement.

The defendant also argues that summary judgment is appropriate because GSB has established legitimate non-discriminatory reasons for the discharge and the plaintiff has failed to supply evidence to show that the stated reasons for her termination were pretextual. As set forth in the defendant's brief, GSB's stated reason for firing Ms. Carlin is that her work performance was poor. GSB asserts that the plaintiff failed to effectively manage the upgrade, and that put GSB in "extreme jeopardy." Further, the defendant says that Ms. Carlin failed to timely advise her supervisor of what needed to be accomplished in order to implement the upgrade, which resulted in other GSB employees having to do a great deal of work in a short amount of time. The defendant claims that due to the magnitude of the work which needed to be done, it would have been impossible for Ms. Carlin to have prepared GSB to meet the deadline following her return from maternity leave.

The plaintiff maintains that these reasons are pretextual. To establish pretext, a plaintiff may meet her burden by showing that the employer's stated justification: (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action. Nocella v. Basement Experts of

Am., 499 F. Supp. 2d 935, 944 (N.D. Ohio 2007). In this instance, the plaintiff attacks GSB's stated justification primarily on the grounds that it did not actually motivate her firing and that it had no basis in fact. In particular, the plaintiff relies on the temporal proximity between her discharge and the protected act; the timing of her discharge; and the fact that GSB offered inconsistent and changing rationales for discharge.

The temporal proximity between Ms. Carlin exercising her rights and her discharge is not enough by itself to prove pretext. See Asmo, 471 F.3d at 598. However, temporal proximity does provide indirect support for Ms. Carlin's claim. Id. And, viewing that indirect support in conjunction with other evidence, the Court is persuaded that there is sufficient evidence by which a reasonable jury would conclude that GSB's stated justification was a pretext for illegal discrimination. There is the timing of discharge. On October 28, 2009, while Ms. Carlin was on leave, Ms. LaMarca spoke to Fidelity and learned that GSB was behind schedule with respect to the upgrade. There is evidence to show that at this time Lamarca believed that the upgrade was Ms. Carlin's responsibility, since LaMarca called Carlin and asked her to return to work to assist in facilitating the upgrade. Two weeks after the plaintiff advised LaMarca that she would consider coming back to work, Ms. LaMarca took part in the decision to fire her. "[T]he timing of [a] decision could lead a fact finder to infer that the employee would not have been fired absent her taking of leave." Kohls v. Beverly Enterprises Wisconsin, Inc., 259 F.3d 799, 806 (7th Cir. 2001). In this instance, given that GSB showed a willingness to allow Ms. Carlin to return to work, if she did so early, a reasonable jury could infer, in light of the other evidence of pretext, that Ms. Carlin was fired not because of her alleged failures in managing the upgrade, but because she did not

12

agree to return to work while exercising her rights. This calls into question GSB's stated reasons for dismissal.

Furthermore, at the time that Carlin was fired, GSB asserted four reasons for doing so. According to Ms. Carlin's notice of termination, her firing was based on the following "serious performance issues":

(1) Failure to make timely mortgage payments

(2) Failure to pay her portion of medical premiums

(3) Failure to submit the quarterly FHLB report

(4) Failure to manage the 9.1 Upgrade.

Now, however, GSB's focus is on the fourth reason only – Ms. Carlin's alleged failure to manage the upgrade. An employer's changing rationale for making an adverse employment decision can be evidence of pretext. Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1167 (6th Cir.1996), amended on other grounds, 97 F.3d 833 (6th Cir.1996). For example, in Asmo, a divided panel of the Sixth Circuit found evidence of pretext based on inconsistencies between the reasons for discharge that were initially offered to the plaintiff and the reasons for discharge advanced after litigation commenced. 471 F.3d at 596. At the time of discharge, the defendant employer provided five reasons, two of which were eliminated after the plaintiff sued. Id. The court found this suspicious because the two that were eliminated were shown to be false. Id. The court reasoned

> It is unclear how [the employer] initially came up with [his] reasons for termination, but the fact that they were later eliminated, and they happen to be the two reasons that [the employer] gave that are false, is very suspicious. It appears that [the employer] offered any and all reasons he could think of to justify his decision to [the plaintiff], whether or not they were true. Once a lawsuit

13

> was filed and [the employer] knew the reasons would be subject to scrutiny, it changed the justifications offered for [the plaintiff's] termination to include only those that were either circumstantially true or could not be as easily penetrated as false. This change in rationale is suspicious and is evidence of pretext.

Id. at 596. In reaching its decision, the Asmo court observed that "[i]n challenging an employer's action, an employee 'must demonstrate that the employer's reasons (each of them, if the reasons independently caused [the] employer to take the action it did) are not true.'" Id. (quoting Kariotis v. Navistar Int'l Trans. Corp., 131 F.3d 672, 676 (7th Cir.1997)) (alterations in original). However, the court concluded that the plaintiff was not required to show that all of the stated reasons were false because the defendant did not argue that each factor would have independently resulted in the plaintiff's discharge. It was sufficient for the plaintiff to show that only some of the factors were false and pretextual.

In this instance, while GSB might claim that it has not abandoned any of its reasons for firing Ms. Carlin, it is plainly no longer relying on three of the reasons it provided initially. In this case, as in Asmo, the reasons that GSB has effectively withdrawn are suspicious. A plaintiff may prove pretext by providing evidence that the stated justification never before formed the basis of a decision to terminate. See Smith v. Chrysler Corp., 155 F.3d 799, 805-06 (6th Cir.1998). As Ms. Carlin points out, there is record evidence showing that two of the withdrawn justifications – that Ms. Carlin was behind on both her mortgage payments and her health insurance premiums – had never been used as a reason for firing a GSB employee prior to Ms. Carlin's firing. (See Doc. 23-9, Pl. Ex. H, at 19). Second, Ms. Carlin provides evidence to show that it was not until after the decision to terminate was made that an inquiry took place with respect

14

to Ms. Carlin's mortgage loan payment history. (Doc. 23-9, Pl. Ex. H, at 29). GSB also relied on Ms. Carlin's alleged failure to prepare a Federal Home Loan Bank Quarterly report, but Ms. Carlin provides evidence to call into question this justification as well. As with the two withdrawn justifications noted above, there is evidence that GSB's inquiry into quarterly report occurred after the decision to terminate Ms. Carlin. (Doc. 23-9, Pl. Ex. H, at 18). In addition, there is evidence that GSB's regulators never complained about her performance in relation to the submission of the FHLB report. (Doc. 23-13, Pl. Ex. L, at 54-55). Based on this evidence, a reasonable juror could infer that GSB was engaging in a post facto justification for Ms. Carlin's termination.

In addition to the above described evidence of pretext, the plaintiff provides evidence calling into question the factual basis for the defendant's stated justification. Contrary to Ms. LaMarca's claim that she was not kept apprised of what needed to be done with respect to the MISER upgrade project, there is evidence that Ms. Carlin did advise Ms. LaMarca. (Doc. 23-2, Pl. Ex. A, at 40-41). Contrary to the claim that Ms. Carlin did not adequately perform her duties by failing to prepare for her departure, there is evidence that Ms. Carlin assigned Jason Bennett to work on the MISER upgrade. (Doc. 23-2, Pl Ex. A, at 61-62). Mr. Bennett was responsible for setting up the test server, which was a prerequisite for the MISER upgrade. (Id. at 69). There is evidence that Ms. LaMarca was aware of this. (Id.). In addition, the plaintiff provides evidence that during an interview, the plaintiff discussed her ongoing projects with Blaine Wolff, the consultant hired by GSB to take over for plaintiff in her absence.(Doc. 23-2, Pl Ex. A, p. 34). While the plaintiff was to meet with Mr. Wolff again to discuss the

15

projects in more detail, her child was born early, requiring an early commencement of leave.

The defendant argues that the Court should give deference to GSB's honest belief that Ms. Carlin was not adequately performing her job duties and grant summary judgment on that basis. In the Court's view, the above described evidence, viewed in favor of the plaintiff, calls into question the legitimacy of GSB's decision to fire Ms. Carlin, and thus summary judgment is not appropriate in this instance. The Sixth Circuit has "recognized that in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain." Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 564 (6th Cir. 2004). Where, as here, issues of fact are involved, disposition by summary judgment is inappropriate, and, given the evidence described above, the Court is persuaded that the question of GSB's true motivations must be determined by a jury.

### The Plaintiff's FMLA Interference Claim

The defendant seeks summary judgment as to the plaintiff's FMLA interference claim. An employer is prohibited from interfering with, restraining, or denying the "exercise [of] or attempt to exercise" any right under the FMLA. 29 U.S.C. § 2615. "If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred. . . . Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer." Arban v. West Pub. Corp., 345 F.3d 390, 401 (6th Cir.2003).

16

To prevail on an FMLA interference claim, a plaintiff must establish that (1) she was an eligible employee as defined under the FMLA; (2) her employer was a covered employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave the employer notice of her intention to take FMLA leave; and (5) her employer denied FMLA benefits to which she was entitled. Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir.2005) (citing Cavin v. Honda of Am. Mfg., Inc., 346 F.3d 713, 719 (6th Cir.2003)).

In the present case, the defendant moves for summary judgment on the last element, arguing that Ms. Carlin fails to provide evidence that GSB denied any benefit to which she was entitled. Specifically, the defendant argues that there was no interference here because GSB's contact with Ms. Carlin while she was on leave is insufficient to prove interference under the case law. In support, GSB cites Soehner v. Time Warner Cable, Inc., No. 1:08-cv-166, 2009 WL 3855176 (S.D. Ohio Nov. 16, 2009). In that case, a plaintiff whose employer contacted him during leave but who felt no pressure to return to work did not present a triable FMLA interference claim when he was restored to his previous position at the conclusion of leave. Soehner is inapposite. Unlike the plaintiff in Soehner, Ms. Carlin was not restored to her original position; instead she was terminated before her leave period ended.

"The issue [under an interference theory] is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve week leave or reinstatement after taking a medical leave." Arban, 345 F.3d at 401 (citation and internal quotation marks omitted). In this instance, Ms. Carlin was scheduled for twelve weeks of FMLA leave. While she was on leave, GSB asked her to

return to work. After she did not agree to return, her employment was terminated. While GSB may ultimately prove that it had legitimate reasons for terminating Ms. Carlin's employment before her leave ended, for the purpose of the present motion, Ms. Carlin has provided sufficient evidence to demonstrate she was denied a benefit to which she was entitled.

*The Plaintiff's FMLA Retaliation Claim*

To establish a *prima facie* case of FMLA retaliation, a plaintiff must show that (1) she was engaged in a statutorily activity; (2) that her employer knew she was exercising her FMLA rights; (3) she suffered an adverse employment action; and (4) a causal connection existed between the protected activity and the adverse employment action. Donald v. Sybra, Inc., 667 F.3d 757, 761 (6th Cir. 2012). The defendant maintains that there are no facts to a demonstrate a causal connection between Ms. Carlin's termination and her maternity leave. The Court disagrees. As discussed above, Ms. Carlin has supplied evidence showing a nexus between the two. There is evidence to show that while Ms. Carlin was on leave, her employer asked her to return to work. After she did not, GSB made the decision to terminate her, while she was exercising her rights. As discussed in more detail above, this evidence sufficiently demonstrates a causal connection between her termination and the exercise of her FMLA rights.

Alternatively, GSB argues that even if Ms. Carlin has provided sufficient evidence of a causal connection, GSB has articulated a legitimate, non-discriminatory reason for her termination, which the plaintiff has failed to demonstrate was pretextual. As discussed above, the plaintiff provided sufficient circumstantial evidence that GSB's

18

stated reasons were pretextual, such that summary judgment is not appropriate in this instance.

### IV. Conclusion

For the reasons stated above, the defendant's motion for summary judgment is denied.

IT IS SO ORDERED.

/s/ Lesley Wells
UNITED STATES DISTRICT JUDGE

Date: 16 June 2015